IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| YETI COOLERS, LLC, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | 1:15-CV-00597-RP |
| RTIC COOLERS, LLC, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court are a series of motions. These are:

(1.)    YETI's Opposed Motion to Redact and/or Seal Portions of the Markman Hearing Transcript (Dkt. 101) ("YETI's Motion to Redact");

(2.)    YETI's Motion to (1) Dismiss RTIC's Counterclaims Relating to Antitrust, Tortious Interference, and Unenforceability; (2) Strike Certain of RTIC's Affirmative Defenses; and (3) Sever and Stay RTIC's Antitrust-Related Counterclaims (Dkt. 83) ("YETI's Motion to Dismiss");

(3.)    YETI's Joinder Motion to Dismiss One of John Jacobsen's and James Jaconbsen's Counterclaims and to Strike Three of Their Affirmative Defenses (Dkt. 97) ("YETI's Joinder Motion"); and

(4.)    Defendants John Jacobsen and James Jacobsen's Motion to Dismiss Patent Infringement Claims (Dkt. 91) ("Jacobsens' Motion").

Each of these motions is ripe for review. After reviewing the motions, the applicable law, and the factual record, the Court issues the following order.

## BACKGROUND

YETI Coolers, LLC ("YETI") "engage[s] in the development, manufacture, and sale of premium, heavy-duty coolers." (Pl.'s Second Am. Compl., Dkt. 64 ¶ 10). In or about 2008, YETI introduced the "Roadie®" and "Tundra®" coolers into the marketplace. (*Id.* ¶ 11). The coolers were "designed and built to provide extreme insulating capabilities and exceptional durability," (*id.* ¶ 12), and YETI has since sold more than 400,000 Roadie® and 1,000,000 Tundra® coolers throughout

1

the United States, (*id.* ¶ 13). YETI owns several trademark registrations, (*id.* ¶ 15), copyright registrations for certain photographs of its coolers, (*id.* ¶ 20), and United States patents, (*id.* ¶ 21).

YETI alleges RTIC and its founders, managers, and owners John and Jim Jacobsen (collectively "the Jacobsens") "have purposefully advertised, promoted, offered for sale, sold, and distributed . . . coolers that infringe on YETI's rights." (*Id.* ¶ 23). Among other claims, YETI accuses RTIC of infringing United States Patents 8,910,819 ("the '819 Patent") and 9,187,232 ("the '232 Patent"). Both the '819 patent and the '232 patent are entitled the "Insulating Container and Latching Mechanism." (*Id.* ¶¶ 21–22).

YETI has moved to redact a portion of the *Markman* hearing transcript. In addition to responding to YETI's Complaint, RTIC has alleged a series of affirmative defenses and counterclaims. YETI has moved to dismiss some of those counterclaims and defenses. The Jacobsens have moved to dismiss YETI's patent infringement claims against them. Each of these motions is ripe for review.

## I.     YETI's Motion to Redact

Special Master Karl Bayer presided over a two-day *Markman* hearing in this case on April 28 and 29, 2016. Transcripts of that hearing were filed as Dockets 86 and 87. Yeti moves to redact and/or seal a limited portion of the *Markman* hearing transcript that purportedly includes YETI's confidential information. YETI requests redaction of lines 10 and 11 of page 13 of Docket 86 because they "discuss valuable, non-public information of YETI that YETI has designated as Confidential Attorney Eyes Only Information pursuant to the protective Order"—specifically, "commercially sensitive financial and research and development information related to products both at issue and not at issue in this litigation that YETI considers confidential and proprietary." (Dkt. 101 at 2). Though YETI "believes that Defendants oppose this motion," RTIC has not

responded to YETI's motion. The deadline for response has passed. *See* Local Rules Rule CV-7(e) ("A response to a nondispositive motion shall be filed not later than 7 days after the filing of the motion.").

Federal Rule of Civil Procedure 5.2(e) allows a court, "[f]or good cause," to (1) require redaction of additional information; or (2) limit or prohibit a nonparty's remote electronic access to a document filed with the court." For good cause shown, and as RTIC did not timely respond to YETI's motion for redaction, the Court grants YETI's motion as unopposed. *See* Local Rules Rule CV-7(e) ("If there is no response filed within the time period prescribed by this rule, the court may grant the motion as unopposed.").

## II.   Motions to Dismiss

YETI and the Jacobsens have filed separate motions to dismiss. When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief," this standard demands more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. The court must initially identify allegations in the complaint that are no more than legal conclusions or "[t]hreadbare recitals of a cause of action's elements," then assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement

to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### A.  YETI's Motions to Dismiss

YETI moves to dismiss RTIC's counterclaims relating to antitrust, tortious interference, and unenforceability; to strike certain of RTIC's affirmative defenses; and, in the alternative, to sever and stay RTIC's antitrust-related counterclaims. (YETI's Motion to Dismiss, Dkt. 83). Subsequent to YETI's filing its motion to dismiss, the Jacobsens filed their response to YETI's Second Amended Complaint. In that response they asserted the same counterclaim of unenforceability and the same affirmative defenses. (*See* Dkt. 90). For purposes of efficiency, YETI moved to join the Jacobsens' counterclaim and affirmative defenses to the claims addressed in its motion to dismiss. (*See* Dkt. 97). Rather than address the issues twice, the Court will apply YETI's motion to dismiss to RTIC and the Jacobsens' counterclaims and affirmative defenses.

### 1.  Motion to Dismiss RTIC's Antitrust Counterclaim

RTIC claims YETI violated Section 2 of the Sherman Act. (Counterclaim, Dkt. 70 ¶¶ 55 – 70). That section makes it an offense for any person to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. RTIC claims YETI monopolized commerce in the premium, heavy-duty cooler market, and in the alternative that YETI attempted to monopolize commerce in that market.

"Unlawful monopolization requires both the existence of monopoly power and anticompetitive conduct." *Intergraph Corp. v. Intel Corp.*, 195 F. 3d 1346, 1353 (Fed. Cir. 1999). Monopoly power is generally defined as "the power to control prices or exclude competition in a

relevant market;" anticompetitive conduct is generally defined as "conduct whose purpose is to acquire or preserve the power to control or exclude competition." *Id.* (citing 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, & 650a, at 66 (1996)). "[A] producer's advantageous or dominant market position based on superiority of a commercial product and ensuing market demand is not the illegal use of monopoly power prohibited by the Sherman Act." *Id.*

Attempted monopolization requires proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

    *a.   Monopoly Power*

RTIC alleges that "[t]he relevant product market is the market for high-end premium heavy-duty coolers" in the United States. (Dkt. 70 ¶¶ 56–57). RTIC alleges that "YETI possesses monopoly power in the market," and cites YETI's Vice President of Marketing, Corey Maynard, to say YETI controls "the vast majority of the market, more than 90%." (*Id.* ¶ 20).

YETI argues RTIC "has failed to allege facts to support its assertion that the relevant market is 'high-end, heavy duty premium coolers in the United States.'" (Dkt. 83 at 13). YETI further argues that RTIC "fails to tie [Mr. Maynard's statement about market share] to the market RTIC alleges is at play here." (*Id.*). Indeed, YETI argues, even if the Court accepts RTIC's proposed market, YETI does not possess monopoly power because, as RTIC concedes, there are other competitors in the market for "premium, heavy-duty coolers." (*Id.* (quoting Dkt. 70 ¶ 20)).

"In ascertaining the relevant product market, courts consider the extent to which the seller's product is 'interchangeable in use' and the degree of 'cross-elasticity of demand between the product itself and substitutes for it.'" *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F. 3d 620 (5th Cir. 2002) (quoting *C.E. Servs., Inc. v. Control Data Corp.*, 759 F. 2d 1241, 1245 (5th Cir. 1985)). Within the

product market, there may exist submarkets which, in themselves, represent product markets for antitrust purposes. *See id.* "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F. 2d 964, 980 (5th Cir. 1977).

RTIC defines the product market to be "high-end, heavy duty premium coolers." (Dkt. 70 ¶¶ 56–57). RTIC alleges "[t]he market for high-end, heavy duty premium coolers in the United States is separate and distinct from the market for ordinary mass-market coolers, and includes customers who engage in hunting, sport fishing, camping, boating, and other wilderness activities," (*id.* ¶ 9); "These customers are willing to pay hundreds of dollars for a high-quality, durable cooler that can withstand a rough ride . . . resist wild animals, and keep its contents cool for a longer period of time," (*id.*); "A key characteristic that separates 'high-end, heavy duty premium coolers' from ordinary mass-market coolers is the use of a rotational molding or 'rotomolding' process to produce significantly thicker and stronger walls," (*id.* ¶ 10). RTIC's allegation of the product market is consistent with the allegations in YETI's Second Amended Complaint, which state that YETI "engage[s] in the development, manufacture, and sale of premium, heavy-duty coolers." (Dkt. 64 ¶ 10). These coolers are "designed and built to provide extreme insulating capabilities and exceptional durability," (*id.* ¶ 12).

The Court finds RTIC's factual allegations are sufficient to define the relevant product market. The Court further finds that RTIC's plausible factual assertions, taken as true, support RTIC's claim that YETI possesses monopoly power in the market for "high-end, heavy duty premium coolers."

*b.   Anticompetitive Conduct*

The question that remains is whether RTIC has alleged facts to show YETI has engaged in anticompetitive conduct, or "conduct whose purpose is to acquire or preserve the power to control or exclude competition." *Intergraph Corp.*, 195 F. 3d at 1353. Alleging facts showing such a purpose is necessary to RTIC's unlawful monopolization and attempted monopolization claims.

RTIC alleges YETI "has willfully maintained and abused" its alleged monopoly power through "anticompetitive and exclusionary acts." (Dkt. 70 ¶ 58). RTIC alleges two anticompetitive and exclusionary acts: the "assertion of meritless legal claims intended to exclude RTIC's coolers from the market;" and the "exclusion of RTIC from access to Persico's Smart Mold electronic rotomolding technology." (*Id.* ¶ 60).

First, RTIC alleges that YETI willfully maintains and abuses its monopoly power through the assertion of "meritless legal claims." RTIC makes this claim against a legal backdrop that guarantees persons' access to courts. The Supreme Court has said that those who petition the government for redress are generally immune from antitrust liability. *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). The Supreme Court has also said that litigation, as a form of petitioning the government for redress, enjoys such immunity. *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

Such immunity has limits; it is withheld when petitioning activity is a mere "sham" to cover interference with a competitor's business relationships. *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993). However, the limits of the immunity are narrowly defined. First, courts determine whether the litigation is a "sham." Litigation is a sham when it is "objectively baseless." *Columbia Pictures Indus., Inc.*, 508 U.S. at 51. That is, litigation is a sham when "no reasonable litigant could realistically expect success on the merits." *Id.* at 60. Second, courts ask

whether the litigant's subjective motivation in initiating the objectively baseless litigation is to "conceal[] 'an attempt to interfere *directly* with the business relationships of a competitor . . . through the 'use [of] the governmental *process.*'" *Id.* at 60–61 (quoting *Noerr Motor Freight*, 365 U.S. at 144) (emphasis in original).

RTIC alleges YETI's litigation is objectively baseless. RTIC relies upon its contention that the patent upon which YETI sues is invalid, as YETI marketed and sold its coolers for more than one year before it filed its patent applications. (Dkt. 70 ¶¶ 2 –25). Based on the contention that the patent is invalid, RTIC cites "numerous other lawsuits filed by YETI in this district" as abuse of YETI's "dominant position in the market to suppress competition by instigating and/or threatening litigation." (*Id.* ¶¶ 26–29).

Objective baselessness means "no reasonable litigant could realistically expect success on the merits." *Columbia Pictures Indus., Inc.*, 508 U.S. at 60. RTIC emphasizes that, "[a]t this stage, the Court must take RTIC's factual allegations of 'sham litigation' in the light most favorable to RTIC," and, because no decision on the merits has yet been made on YETI's patent, trademark, or trade dress claims, "the Court cannot determine as a matter of law that YETI's claims are not objectively baseless." (RTIC's Resp., Dkt. 93 at 11). The Court finds the opposite to be true—while YETI has filed numerous lawsuits on these patents, no decision on the merits has been made on YETI's patent, trademark, or trade dress claims. As such a reasonable litigant *could* expect success on the merits. A presumption of validity attaches to issued patents, and the Supreme Court has said that the presumption of validity "takes away any need for a plaintiff to prove his patent is valid to bring a claim." *Commil USA, LLC v. Cisco Systems, Inc.*, 135 S. Ct. 1920, 1929 (2015). Therefore, even accepting as true all of RTIC's factual allegations, the Court finds that RTIC has plead insufficient facts to support the legal conclusion that YETI engages in "sham" litigation to exclude competition.

Second, RTIC alleges that YETI willfully maintains and abuses its monopoly power through "exclusion of RTIC from access to Persico's Smart Mold electronic rotomolding technology." (Dkt. 70 ¶ 60). In particular, RTIC alleges that "YETI had an exclusivity agreement with Persico [Industrial S.p.A.]," an Italian company that developed "Smart Mold" rotational molding technology. (*Id.* ¶ 12). Though YETI's exclusivity agreement "originally covered only conventional rotomolding machines and molds," "after YETI learned of RTIC's effort to purchase Smart Mold machines, [it] pressured Persico to extend the exclusivity agreement to cover the Smart Mold technology. (*Id.* ¶ 16). By YETI's "exclusion of RTIC from access to Persico's Smart Mold electronic rotomolding technology . . . RTIC will be forced to continue manufacturing its coolers using the less efficient and more expensive conventional rotomolding process, and will be forced to pass those higher expenses on to its consumers." (*Id.* ¶ 60). RTIC argues that YETI's prohibiting competitor access to the Smart Mold process results in "higher prices and less innovation." (*Id.* ¶ 61).

YETI argues that RTIC's allegations fail to state a claim upon which relief can be granted: "[t]he federal antitrust laws protect competition, not competitors," *Jebaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F. 3d 314, 320 (5th Cir. 2009), and "RTIC does not even allege this conduct has or could prevent RTIC, much less other competitors, from competing." (Dkt. 83 at 10). YETI argues not only that RTIC has failed to allege harm to competition, but that it could not do so: "Smart Mold" rotomolding is "just one type of process that can be used to manufacture high-end premium heavy-duty coolers." (Dkt. 83 at 11). RTIC "can continue to compete using existing manufacturing technologies," and "the U.S. market for high-end premium heavy-duty coolers" is "teeming with competitors." (Dkt. 83 at 11–12).

"[A]ntitrust plaintiffs must allege and prove an injury that 'reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the

violation.'" *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F. 3d 412, 419–20 (5th Cir. 2010) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 289 (1977)). "The mere existence of an exclusive dealing clause does not establish an antitrust violation." *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F. 2d 1033, 1036 (5th Cir. 1981). The Court looks to Section 3 of the Clayton Act, 15 U.S.C. § 14 as a guide for when an exclusive dealing clause like YETI's may establish an antitrust violation. That provision forbids

> any person engaged in commerce . . . to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented . . . on the condition . . . that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14. Importantly, an exclusive dealing contract does not violate the antitrust law "unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *see also Bob Maxfield*, 637 F. 2d at 1036.

RTIC has not alleged that Persico provides the only viable process for production; or that other competitors have attempted to purchase or use Persico machines; or that RTIC or any other competitor has been prevented from competing by virtue of YETI's exclusive dealing arrangement. RTIC has not alleged anticompetitive effect or, as is required, anticompetitive purpose. That is, "conduct whose purpose is to acquire or preserve the power to control or exclude competition." *Intergraph Corp.*, 195 F. 3d at 1353 (Fed. Cir. 1999). The Court finds that RTIC has failed to plead sufficient factual matter to support a claim of anticompetitive conduct. Accordingly, RTIC's antitrust counterclaim is dismissed.

### 2.  Motion to Dismiss RTIC's Tortious Interference Counterclaim

RTIC alleges a "reasonable probability that RTIC would enter into an agreement with Persico to purchase Persico's Smart Mold rotomolding machines." (Dkt. 70 ¶ 72). "Beginning in late 2015, RTIC communicated with Persico about purchasing Smart Mold machines for the purpose of manufacturing its coolers in the United States." (Dkt. 70 ¶ 14) (emphasis added). On February 1, 2016, Persico informed RTIC that it had signed a new exclusivity agreement with YETI and could not sell the Smart Mold machines to RTIC.

RTIC alleges that YETI "willfully and intentionally interfered with RTIC's prospective business relationship with Persico by, among other things, forcing Persico to enter into an exclusionary agreement under which Persico is prohibited from selling its Smart Mold rotomolding machines to RTIC." (*Id.* ¶ 73). Such conduct was "independently tortious and unlawful" because YETI's "anticompetitive and exclusionary conduct violated section 2 of the Sherman Act." (*Id.* ¶ 76). YETI moves to dismiss RTIC's counterclaim.

"[T]o establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W. 3d 711, 713 (Tex. 2001). RTIC claims YETI's conduct was "independently tortious or unlawful" because it violated antitrust laws. (Dkt. 70 ¶ 76). Having dismissed RTIC's antitrust claims against YETI, the Court finds that RTIC has pled insufficient facts to state a claim for interference with a prospective contractual relation.

Accordingly, the Court dismisses RTIC's tortious interference counterclaim.

### 3.   Motion to Dismiss RTIC's and the Jacobsens' Unenforceability Counterclaim

RTIC and the Jacobsens request a declaration that the claims of the '819 patent and the '232 patent are unenforceable. (*See* Dkt. 70 ¶ 42). YETI argues the claim "fails to comply with the necessary pleading standards." (Mot. Dism., Dkt. 83, at 14).

Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F. 3d 1276. It claims that the patent applicant—in this case, YETI—violated its duty "to prosecute patent applications with candor, good faith, and honesty." *Semiconductor Energy Lab. Co., Ltd. V. Samsun Elecs. Co., Ltd.*, 204 F. 3d 1368, 1373 (Fed. Cir. 2000) (citing *Molins PLC v. Textron, Inc.*, 48 F. 3d 1172, 1178 (Fed. Cir. 1995)). Inequitable conduct involves the "affirmative representation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins PLC*, 48 F. 3d at 1178. To show unenforceability, the alleged infringer—in this case, RTIC—"must demonstrate by clear and convincing evidence both that the information was material and that the conduct was intended to deceive." *Id.* The materiality required to establish inequitable conduct is "but-for materiality," that is, "the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference," *Therasense*, 649 Fed. 3d at 1291; the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence," *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F. 3d 1357, 1366 (Fed. Cir. 2008).

"A charge of inequitable conduct conveniently expands discovery into corporate practices before patent filing and disqualifies the prosecuting attorney from the patentee's litigation team." *Therasense*, 649 F. 3d, at 1288. Moreover, and "[p]erhaps most importantly, the remedy for inequitable conduct is the 'atomic bomb' of patent law." *Id.* (citing *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 525 F. 3d 1334, 1349 (Fed. Cir. 2008) (Rader, J., dissenting)). Inequitable conduct

12

regarding any single claim renders the entire patent unenforceable, cannot be cured by reissue or reexamination, and "can spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Id.* Despite—or because of—these consequences, "charging inequitable conduct has become a common litigation tactic." *Id.* at 1289. The Federal Circuit has written that "the habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Burlington Indus., Inc. v. Dayco Corp.*, 849 F. 2d 1418, 1422 (Fed. Cir. 1988).

Accordingly, the Federal Circuit has tightened the standards for finding both intent and materiality, and applies the pleading standards of Federal Rule of Civil Procedure Rule 9(b) to allegations of inequitable conduct. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F. 3d 1312, 1326 (Fed. Cir. 2009). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "A pleading that simply avers the substantive elements of inequitable conduct, without setting forth the particularized factual bases for the allegation, does not satisfy Rule 9(b)." *Exergen Corp.*, 575 F. 3d at 1327. Pleadings must detail the "who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Id.*

RTIC's counterclaim Count IV pleads that, "[b]ased on YETI's filing this action and at least RTIC's first affirmative defense, an actual controversy has arisen and now exists between the parties as to the infringement of the claims of the '819 patent and the '232 patent;" RTIC thuerefore seeks a declaratory judgment "that the claims of the '819 patent and the '232 patent are unenforceable." (Dkt. 70 at 61 ¶¶ 41 – 42). RTIC bolstered the claim in its response to YETI's motion to dismiss, arguing that "YETI was clearly aware of its own product that it offered for sale more than one year prior to filing [its Provisional Application]." (Dkt. 93 at 14). The product "included the claimed

features of the patents" and, after receiving its patents, "YETI then used those patents to file lawsuits against its competitors." (*Id.* at 15). YETI responds that, to the extent RTIC alleges YETI failed to disclose its prior art coolers, RTIC's claim would fail because YETI disclosed those coolers to the PTO and the examiner considered them.

The Court finds that RTIC's unenforceability claim falls short of the pleading requirements of Rule 9(b). Even allowing RTIC to bolster its claim in its response, RTIC has failed to detail the "who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen Corp.*, 575 F. 3d at 1327.

RTIC requests that, in the alternative to dismissal, "it be permitted to amend its counterclaim." (Dkt. 93 at 15). Courts "should freely give leave [to amend] when justice so requires." *Leal v. McHugh*, 731 F. 3d 405, 417 (5th Cir. 2013) (quoting Fed. R. Civ. P. 15(a)(2)). Finding that RTIC pleads insufficient factual matter to state a claim, the Court dismisses without prejudice RTIC's unenforceability counterclaim. The Court will not in this Order grant RTIC leave to amend; the timeliness of such amendment, the prejudice on YETI, and the futility of amendment are all factors the Court must consider if and when RTIC files for such leave. *See, e.g.*, *Martin's Herends Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co.*, 195 F. 3d 765, 771 (5th Cir. 1999) (noting that decision on leave to amend reviewed for abuse of discretion).

### 4. Motion to Dismiss RTIC's and the Jacobsens' Affirmative Defenses

YETI moves to strike RTIC's and the Jacobsens' fifth, fifteenth, and twentieth affirmative defenses as "insufficient as a matter of law."

Federal Rule of Civil Procedure 8(b) requires a party responding to a pleading to "state in short and plain terms its defenses to each claim asserted against it." A denial "must fairly respond to the substance of the allegation," Fed. R. Civ. P. 8(b)(2), but "a party that intends in good faith to

deny all the allegations of a pleading . . . may do so by a general denial," *id.* 8(b)(3). Federal Rule of Civil Procedure 8(c) requires a party to "affirmatively state any avoidance or affirmative defense," including "estoppel," "fraud," and "laches." Rule 8(c) requires a defendant to plead an affirmative defense with enough specificity to give the plaintiff "fair notice" of the defense being advanced. *Woodfield v. Bowman*, 193 F. 3d 354, 362 (5th Cir. 1999). In some cases, "merely pleading the name of the affirmative defense . . . may be sufficient." *Id.*

If a responsive pleading is "so vague or ambiguous that the party cannot reasonably prepare a response," a party may move for "a more definite statement." Fed. R. Civ. P. 12(e). If a matter is "redundant, immaterial, impertinent, or scandalous," or if a defense is "insufficient," the court may strike the matter or defense on its own or on a motion made by a party. *Id.* 12(f).

"Both because striking a portion of a pleading is a drastic remedy, and because it is often sought by the movant as a dilatory tactic, motions under Rule 12(f) are viewed with disfavor and are infrequently granted." *FDIC v. Niblo*, 821 F. Supp. 441, 449 (N.D. Tex. 1993) (citing *Augustus v. Bd. Of Pub. Instr. Of Escambia Cty.*, 306 F. 2d 862, 868 (5th Cir. 1962)). When a motion to strike is premised on the "insufficiency" of a defense, a movant must show that the defense is insufficient as a matter of law. *See Joe Hand Promotions, Inc. v. HRA Zone, L.L.C.*, 2013 WL 5707810 (W.D. Tex. Oct. 18, 2013). The Fifth Circuit has not addressed whether *Twombly* and *Iqbal* have changed the pleading standard for affirmative defenses, but at least one case decided after *Twombly* indicates that the "fair notice" requirement for affirmative defenses has not changed. *See Rogers v.* McDorman, 521 F. 3d 381, 385–86 (5th Cir. 2008) (applying *Woodfield*'s "fair notice" standard to find defendants' affirmative defense had not been waived). As an alternative to striking affirmative defenses, Courts may grant leave to amend the pleadings. *See* Fed. R. Civ. P. 15(a)(2).

*1.   Fifth and Twentieth Affirmative Defenses*

RTIC's and the Jacobsens' fifth affirmative defense reads in its entirety that "YETI's attempted enforcement of the '819 Patent and the '232 Patent against RTIC is barred by one or more of the equitable doctrines of laches, estoppel, acquiescence, waiver, and unclean hands." (Dkt. 70 at 46). RTIC's and the Jacobsens' twentieth affirmative defense reads in its entirety that "YETI is not entitled to relief by virtue of the doctrines of estoppel, waiver, acquiescence and/or additional equitable doctrines." (*Id.* at 48).

YETI argues these "simply recite the names of defenses, and therefore are insufficient because they do not give YETI 'fair notice' of the grounds for the defenses." (Dkt. 83 at 18). RTIC responds that the defenses provide fair notice, and explains that they relate to YETI's sales for over a year prior to filing its provisional application for a patent; such sales should have barred the grant of the patent application, but RTIC argues YETI made false representation to the Patent and Trademark Office to circumvent the on sale bar. (*See, e.g.*, Dkt. 70 at 54 – 58).

The Court finds that, within the context of RTIC's answer, affirmative defenses, and counterclaims, RTIC's defenses offer sufficient "fair notice" of the defenses such that YETI is not a victim of "unfair surprise." *Woodfield*, 193 F. 3d at 362.

*2.   Fifteenth Affirmative Defense*

RTIC and the Jacobsens next argue that YETI's claims

> are barred in whole or in part by inequitable conduct. Specifically, YETI falsely represented under oath to the United States Patent and Trademark Office that no other person has the right to use the asserted trade dress in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion or mistake, or to deceive, when in fact the evidence will show YETI knew there was widespread use of the design.

(Dkt. 70 at 48).

YETI argues the so-called "Inequitable Conduct" affirmative defense fails at the outset, as "allegations of inequitable conduct with respect to a trademark registration have **no effect** on a plaintiff's common law rights, like the trade dress rights YETI is asserting here." (Dkt. 83 at 16). Further, "YETI's trade dress registration application is still pending, meaning there is not an actual 'registration' that has (allegedly) been obtained via inequitable conduct or fraud." (*Id.*). Finally, YETI argues the defense must—but fails to—meet the heightened pleading standard for fraud under Rule 9(b). (*Id.*).

RTIC responds that "[it] has pled with sufficient particularity to give YETI fair notice that YETI's own products were offered for sale," (Dkt. 93 at 16), but does not otherwise respond to YETI's arguments about effect and heightened pleading standards.

As a preliminary matter, the Court does not, like YETI, read the fifteenth affirmative defense as limited to YETI's common law trade dress rights. By its terms, the defense goes to "YETI's claims." (Dkt. 70 at 47). The Court cannot say, then, that the defense is irrelevant to the merits of YETI's claims.

The Court's focus instead is whether the affirmative defense is adequately pleaded. The Court has determined to dismiss RTIC's *counterclaim* of inequitable conduct in light of the Federal Circuit's heightened pleading standards. The question, then, is whether the Court applies different standards to RTIC's counterclaim and its affirmative defense.

The pleading standards articulated in *Twombly* and *Iqbal* may not apply to affirmative defenses generally, but there is reason to believe the pleading standards articulated for charges of inequitable conduct articulated by the Federal Circuit in *Exergen*, *supra*, apply to RTIC's inequitable conduct affirmative defense. "A charge of inequitable conduct conveniently expands discovery into corporate practices before patent filing and disqualifies the prosecuting attorney from the patentee's

17

litigation team." *Therasense*, 649 F. 3d, at 1288. Moreover, and "[p]erhaps most importantly, the remedy for inequitable conduct is the 'atomic bomb' of patent law." *Id.* (citing *Aventis Pharma S.A.*, 525 F. 3d at 1349). "[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Burlington Indus.*, 849 F. 2d at 1422, and the Federal Circuit has attempted to limit parties' capacity to level such a charge. *See Exergen Corp.*, 575 F. 3d at 1326.

In light of the implications of a charge of inequitable conduct, the Court declines to apply simple "notice pleading." Having found insufficient basis to allow RTIC's counterclaim on the basis of inequitable conduct, the Court finds RTIC's defense of inequitable conduct to be "insufficient." Accordingly, RTIC's and the Jacobsens' fifteenth affirmative defense is hereby struck. Fed. R. Civ. P. 12(f).  RTIC may, if the conditions for amendment articulated *supra* are met, amend its affirmative defense consistent with this order.

### 5.   The Jaconbsens' Motion to Dismiss YETI's Claims against Them

The Jaconbsens move to dismiss the Second Amended Complaint's claims for patent infringement as pled against them. Specifically, the Jacobsen's move to dismiss Count VIII, which alleges direct infringement, inducement, and willful infringement by the Jacobsens of the '819 Patent, and Count IX, which alleges direct infringement, inducement, and willful infringement by the Jacobsens of the '232 Patent. (*See* Dkt. 91 at 2). The Jacobsens argue that YETI has failed to plead sufficient facts to make plausible the piercing the corporate veil as required for individual liability for direct patent infringement, and to make plausible the willful intent to induce infringement.

Both claims allege violations of 35 U.S.C. § 271. Section 271 provides for liability for patent infringement. Liability for direct infringement is provided by subsection (a), which states, "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States

or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). Liability for infringement by inducement is provided by subsection (b), which states, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." *Id.* § 271(b).

  a. *Direct Infringement*

  Though the question is not entirely settled, the Court reads Federal Circuit precedent to say personal liability for corporate officers for direct patent infringement requires piercing the corporate veil. At least three opinions by the Federal Circuit have found such a requirement expressly. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990) ("[T]o be personally liable for . . . infringement under section 271(a), there must be evidence to justify piercing the corporate veil."); *Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1331) (Fed. Cir. 1999) ("Personal liability under § 271(a) . . . requires sufficient evidence to justify piercing the corporate veil." (citing *Manville*)); *Wordtech Systems, Inc. v. Integrated Networkds Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) ("[T]he 'corporate veil' shields a company's officers from personal liability for direct infringement that the officers commit in the name of the corporation, unless the corporation is the officers' 'alter ego.'").[1]

  In Texas, "there are three broad categories in which a court may pierce the corporate veil: (1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud." *Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138, 143 (5th Cir. 2004). YETI's Complaint does not contain facts sufficient to allege that the corporate veil should be pierced with respect to the Jacobsens. YETI does not argue that it does, and instead maintains that "[it] may later address the issue of piercing the corporate veil based on further

---

[1] YETI does not dispute this interpretation in responding to the Jacobsen' motion to dismiss.

discovery." (Resp., Dkt. 98, at 4 n.1; YETI's Motion for Leave to File Its Second Am. Compl., Dkt. 63, at 10 n.3). Thus YETI's claim against the Jacobsens for patent infringement under § 271(a) is dismissed.

> b. *Inducement*

Section 271(b) imposes liability on "[w]hoever actively induces infringement of a patent." 35 U.S.C. § 271(b). Unlike direct infringement, induced infringement under § 271(b) does not require piercing the corporate veil. *Manville Sales Corp.*, 917 F.2d at 553 ("Under [section 271(b)], corporate officers who actively assist with their corporation's infringement may be personally liable for inducing infringement regardless of whether the circumstances are such that a court should disregard the corporate entity and pierce the corporate veil.").

In order to induce infringement under § 271(b), a defendant must have both "knowledge of the patent," and knowledge that "the [induced] acts were infringing." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, --- F.3d ---, 2016 WL 3124704, at *1 (Fed. Cir. June 3, 2016) (alteration in original) (quoting *Commil USA, LLC v. Cisco Systems, Inc.*, 135 S. Ct. 1920, 1926 (2015)). "[W]illful blindness can satisfy the knowledge requirement for active inducement under § 271(b) . . . even in the absence of actual knowledge." *Id.*

YETI argues first that the Jacobsens' motion to dismiss is "doomed from the outset because they have conceded that YETI's patent infringement counts are proper by asserting declaratory judgment counterclaims against YETI for patent non-infringement and invalidity." (Dkt. 98 at 2). "If the Court were to dismiss YETI's patent infringement counts, YETI would likely have to bring them as counter-counterclaims." (*Id.*).

YETI argues second that it has stated a claim for inducing patent infringement. Specifically, YETI has argued that the Jacobsens personally "design[ed], develop[ed], market[ed], s[old], etc. the

accused cooler products even though they knew of YETI's patents." (*Id.* at 4). For example, YETI

has pled the Jacobsens and RTIC's products "are in the same sizes as YETI's own products, and

they are confusingly similar imitations of YETI's own products," (Dkt. 64 ¶ 24); "[t]he Jacobsens are

responsible for overseeing all aspects of RTIC's infringing cooler products, including design,

advertising, marketing, and sales," (*id.*); "YETI provided notice to RTIC and the Jacobsens of YETI

having patent rights protecting its coolers at least as early as September 5, 2014," (*Id.* ¶¶ 96, 106).

Further,

> On information and belief, RTIC's and the Jacobsens' infringement of the ['810 and
> '232] patent[s] has been and is in willful disregard of the ['819 and '232] patent[s] and
> the rights created thereunder, as evidenced at least by the similarities between the
> Infringing Products and the inventions claimed in the ['819 and '232] patent[s], by
> RTIC's and the Jacobsens' stated intent to provide products that have 'all of the
> features of the YETI® Coolers,' and by RTIC's and the Jacobsens' continuing
> disregard for YETI's rights.

(*Id.* ¶¶ 98, 108).

In the alternative, YETI argues that, even if the Jacobsens did not have the requisite specific

intent before YETI filed its lawsuit in July 2015, they did when YETI added its inducement claims

against them in its Second Amended Complaint. As such, the Second Amended Complaint provided

notice to support YETI's inducement counts. *See, e.g.*, *Script Sec. Sols. L.L.C. v. Amazon.com, Inc.*, 2016

WL 1055827, at *7 (E.D. Tex. Mar. 17, 2016) (collecting cases for the proposition that a complaint

provides sufficient notice of the existence of the patent-in-suit to support a claim of indirect

infringement).

The Court finds these allegations, taken as true, suffice to state a claim for inducement.

YETI has plausibly alleged that the Jacobsens had knowledge of YETI's patents and induced RTIC

to create and sell products that they knew infringed on those patents. Accordingly, the Jacobsens'

motion to dismiss these claims is denied.

## CONCLUSION

IT IS ORDERED that YETI's Motion to Redact and/or Seal Portions of the Markman Hearing Transcript (Dkt. 101) is GRANTED.

IT IS FURTHER ORDERED that the Court Reporter and Clerk shall redact and seal lines 10 – 11 of page 13 of the April 28, 2016 *Markman* hearing transcript (Dkt. 86). Access to the redacted portions of the transcript will be limited to the Court and counsel of record.

IT IS FURTHER ORDERED that Yeti's Motion to Dismiss and Strike (Dkt. 101)—as directed toward RTIC and the Jacobsens (Dkt. 97)—is GRANTED IN PART and DENIED IN PART.

IT IS FINALLY ORDERED that the Jacobsens' Motion to Dismiss (Dkt. 91) is GRANTED IN PART and DENIED IN PART.


**SIGNED** on August 1, 2016.


_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE