**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **YETI COOLERS, LLC,** | § | |
| | § | |
| **V.** | § | **A-15-CV-597-RP** |
| | § | |
| **RTIC COOLERS, LLC, et al.** | § | |

## <u>ORDER</u>

Before the Court is Defendants' Motion to Exclude the Report and Testimony of YETI's

Expert Yoram Wind (Dkt. No. 237); YETI's response (Dkt. No. 277); and RTIC's reply (Dkt. No.

320). The motion was referred to the undersigned for resolution.[1]

Jerry (Yoram) Wind is the Lauder Professor of Marketing at the Wharton School of the

University of Pennsylvania. He received his Ph.D. from Stanford University in 1967, and has been

teaching and researching at the Wharton School since obtaining his doctorate. YETI retained Wind

to provide his opinion on whether YETI's trade dress had acquired secondary meaning as of the end

of June 2015 (before RTIC began selling coolers), and also whether that secondary meaning has

changed since that time. He was also asked to provide his opinion regarding whether RTIC's coolers

cause a likelihood of confusion with YETI's coolers. RTIC seeks to exclude his testimony, arguing

that he: (1) improperly relied on post-June 2015 evidence to establish that YETI's trade dress had

secondary meaning as of June 2015; (2) failed to tie the evidence he relies on to the asserted trade

dress, instead conflating the asserted trade dress with the YETI name; (3) failed to use any cogent

---

[1]This is one of 16 motions the parties have filed challenging their opponent's experts under *Daubert* and FED. R. EVID. 702. Because the standard applicable to the review of this type of motion is well-known, and to avoid repeating itself over and over in these orders, the Court will not set out here the black letter law governing such motions. Suffice it to say the Court did in fact apply the standard set out in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and its progeny, as codified in Rule 702.

methodology in collecting consumer comments online, leading to biased "cherry picking" of comments; and (4) improperly offers opinions that are not helpful or necessary to the fact finder.

## A.      Post-2015 Evidence

RTIC contends that Wind improperly considered evidence of advertising and enforcement post-June 2015 to establish that YETI's trade dress had secondary meaning.  It argues that YETI must show that its trade dress had secondary meaning prior to the date the alleged infringement began. Dkt. No. 237 at 2 (citing to *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978)).  Because the alleged infringement here began in June 2015, RTIC argues that any evidence of secondary meaning after that date is irrelevant.  According to RTIC, if Wind relied on irrelevant evidence, then his opinion is unreliable.  YETI disagrees, contending first that post-June 2015 evidence would be relevant to secondary meaning, and moreover is required for several factors. YETI also argues that Wind substantially relied on pre-June 2015 evidence to make his determination.

Wind's analysis of post-June 2015 evidence does not render his opinion unreliable.  Such evidence can sometimes be relevant in determining secondary meaning.  *See Black & Decker Corp. v. Positec USA, Inc.*, No. 11-CV-5426, 2015 WL 5612340, *9-10 (N.D. Ill. Sept. 22, 2015) (finding that evidence of secondary meaning after the alleged infringement was relevant); *Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184, 203 (D. Mass. 2015) (allowing a survey taken well after the time of infringement and instead "examin[ing] the timing to determine the strength of the evidence.").  RTIC argues that evidence of secondary meaning after the alleged infringement date is only relevant when the market is unchanged.  *See Black and Decker*, 2015 WL 5612340, *10. RTIC contends it significantly changed the market by entering it, and thus any marketing and sales

evidence taken after the alleged infringement date is irrelevant.  Dkt. No. 320.  But this argument asks the Court to make a factual determination of whether the market has changed, and thus is better suited to be a topic of cross-examination at trial.  It is not a basis for excluding Wind's testimony. *See Black & Decker*, 2015 WL 5612340, at \*10 (finding that the jury could assess whether the marketplace had changed enough to make the survey inapplicable).

Moreover, the extent of Wind's reliance on evidence after the alleged infringement date goes to the weight, rather than admissibility, of his testimony.  Though Wind addresses a number of marketing materials, sales, and enforcement efforts from post-June 2015, he also identifies the date of each of the items he assesses.  As noted in his report, a significant percentage of the materials and facts were from pre-June 2015.  Wind states that the additional materials show the continuation of secondary meaning after the alleged infringement date. RTIC will have an opportunity to examine Wind on how he relied on the different pieces of evidence.  Thus, Wind's use of post-June 2015 materials does not render his testimony inadmissible.

**B.     Failure to Distinguish YETI's Trade Dress From its Brand**

Next, Defendants contend that Wind's testimony on secondary meaning is unreliable because his analysis of YETI's marketing failed to separately address YETI's trade dress and brand. Similarly, the social media landscape report addressed all comments about YETI and its competitors, rather than solely collecting comments about the alleged trade dress.  RTIC says Wind's reliance on this report also makes his opinion unreliable.  YETI disagrees, noting that much of Wind's evidence used to support his conclusions directly addresses the trade dress.  Moreover, YETI argues that the fact that the advertising has elements of brand, as well as trade dress, makes his reliance on these materials reasonable.

The Court agrees with YETI that RTIC is drawing too fine a distinction. While at least some of the marketing materials discussed in the report almost certainly were not aimed at YETI's trade dress, this is not grounds to exclude Wind's entire report. *See Sally Beauty Supply Co. v. Beautyco, Inc.*, 304 F.3d 964, 974, 980 (10th Cir. 2002) (considering a survey in which the trade dress and trademark were not separated, and finding evidence of actual confusion of the trade dress). In fact, in each of the cases RTIC cites that address marketing and advertising, the courts are assessing whether the evidence provided established secondary meaning, and were not addressing a *Daubert* challenge. *See Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 44 (1st Cir. 2001); *Sally Beauty Supply Co.*, 304 F.3d at 974; *Pebble Beach Co. v. Tour 18 I Ltd.*, 942 F. Supp. 1513, 1559 (S.D. Tex. 1996).[2] Thus, the extent to which the advertising emphasizes the trade dress will affect the weight afforded Wind's testimony, but should not be a basis for exclusion. Moreover, Wind focuses much of his analysis on the features of trade dress that YETI is attempting to protect; in his report, he analyzes multiple images of YETI's marketing and advertising that feature the trade dress to support his conclusions. The fact that not all of the materials he used solely address trade dress goes to the weight of his testimony.

Additionally, Wind's reliance on the ListenLogic social media landscape report does not render his testimony unreliable. RTIC argues that the report failed to limit the collection to

---

[2]Defendants additionally rely on *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 180 (S.D.N.Y. 2012), where the court excluded a survey on the basis that the expert merely "chose a control that shared 'certain characteristics' with the test product." *Id.* There, the results of the survey were unreliable as it was unclear to which of the elements the consumers were expressing source confusion. This case is distinguishable on several points, the most important being that the court in that case excluded the report because the *control* in the survey was unreliable, rendering all results unreliable. Here, any concerns with Wind's conflation of the trade dress and brand can be addressed with cross-examination.

comments made about YETI's trade dress, instead considering *all* comments made about YETI and its competitors.  Wind's reliance on this report would, according to RTIC, make his testimony unreliable.  However, the fact that some of the comments may not refer specifically to trade dress does not make Wind's testimony unreliable, but rather is a factor that may be addressed at trial by cross-examination.  As noted above, the cases relied on by RTIC do not address reliability of the evidence, but rather its weight.  Then, in *Sally Beauty Co.*, the court found that a survey that tested the trademark and trade dress together provided evidence of actual confusion of the trade dress—though not the trademark—because many participants cited the packaging as the basis of their confusion. 304 F.3d at 974, 979-80.  The ListenLogic report is similar in that it collected all comments about YETI, but Wind analyzed comments directed at the trade dress.  Moreover, RTIC has access to all of the material and may cross-examine Wind on the issue.  Thus, this objection, like so many others, goes to the weight of the testimony, rather than the admissibility of the report as a whole.[3]

## C.   Methodology

RTIC also argues that Wind's testimony is unreliable as his choice in illustrative social media comments did not rely on a methodology that is systematic and could be reproduced.  In other words, RTIC contends that Wind randomly chose comments, or cherry-picked them, rather than following

---

[3]Defendants additionally argue that the ListenLogic report is unreliable as the comments themselves are unreliable and do not represent opinions relevant to the litigation.  But commentators have noted that social media can be one of the best indicators of secondary meaning.  Ronald Coleman, *Fashion Dos: Acknowledging Social Media Evidence as Relevant to Proving Secondary Meaning*, 106 TRADEMARK REP. 776, 778-79 (2016).  Coleman's view is that analysis of social media is no more inherently unreliable than other methods that summarize consumers' impressions. *Id.* at 781.  Also, YETI notes that all of the comments in the report have been documented, and that RTIC was given this information.  Any arguments about the reliability of these sources can be addressed by cross-examination.

a method of selection that could then be reproduced.  YETI responds stating that Wind explained how he "sampled and analyzed the comments" in his report, and thus his testimony is reliable.  The Court agrees.  First, "'technical . . . or other specialized knowledge,' may be relevant and reliable, and therefore admissible under *Daubert*, even if the field of knowledge, be it marketing or plumbing, does not readily lend itself to a formal or quantitative methodology."  *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 364–65 (S.D. N.Y. 2014) (quoting FED. R. EVID. 702).  Wind's analysis of social media comments and advertising would clearly fall into this category.  Thus, it is not necessary for Wind to have followed a "formal or quantitative" methodology when analyzing whether the comments established secondary meaning.  Rather, he relied on his knowledge of marketing and brand awareness to make this determination.

Wind's analysis of secondary meaning relied in part on a report generated by ListenLogic, discussed above, that provided an entire collection of social media comments.  Wind first analyzed on a general level consumers' impressions of the YETI brand and trade dress.  From this collection, he selected a number of comments to analyze more specifically.  His methodology does not reach the unreliability of "ask[ing] people in [the] office," (*id.*); "anecdotal conversations" with patients, *Playtex Prod., Inc. v. Procter & Gamble Co.*, No. 02-CIV-8046, 2003 WL 21242769, *10 (S.D.N.Y. May 28, 2003); or the "consensus and opinion of others" the expert knew, *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 482 (S.D.N.Y. 2000).  Instead, based on his long experience, Wind opines—based on the conclusions of the ListenLogic report—that the comments he selected were representative of the overall collection.  *See Louis Vuitton Mallatier S.A. v. Sunny Merchandise Corp.*, 97 F. Supp. 3d 485, 504, 507 (S.D.N.Y. 2015) (permitting two reports that helped to synthesize voluminous material into a coherent report).  RTIC argues that it is impossible to replicate

the results, but Wind's brand awareness analysis simply does not require the "quantitative" method courts require for other forms of expert analysis.  RTIC has all of the raw data, and if it believes the items selected by Wind are unrepresentative of the whole, it can surely demonstrate this on cross-examination.

## D.    Helpful to the Fact Finder

Lastly, RTIC contends that Wind's testimony on the similarity of the products and intent to copy should be excluded because his testimony does not require expertise, and are determinations jurors may make for themselves.  To support its assertion, RTIC notes that even Wind remarked that a juror could easily see how similar the products are, and read the documents relied on by Wind in determining intent to copy.  YETI argues that the fact finder would be assisted in its similarity analysis by Wind as he can point out specific details for the jurors to focus on.  Similarly, YETI argues that Wind's experience and knowledge can help the jury understand the documents reflecting intent to copy.

RTIC presents several cases in which the court found that an expert was unnecessary to opine on these two topics.  Dkt. No. 237 at 9-10.  However, allowing Wind to offer testimony of the similarity of the products and intent to copy is within the court's discretion.  *See Betterbox Comm'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329-30 (3d Cir. 2002) (finding that even if admitting testimony of the similarity of marks was an abuse of discretion, it was harmless error); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 571-72 (S.D.N.Y. 2007) (allowing expert testimony on intent to copy when an expert could be helpful in determining the overlap in features). Here, Wind is testifying to a number of factors of both secondary meaning and likelihood of confusion.  Testimony regarding the similarity of the products and evidence of an intent to copy fit neatly within his other

7

testimony, and may be helpful to the jury—both in comparing specific aspects of the trade dress and in gleaning intent from the documents.  Moreover, this objection, even if valid, is not a basis for excluding all of Wind's testimony.

ACCORDINGLY, Defendants' Motion to Exclude the Report and Testimony of YETI's Expert Yoram Wind (Dkt. No. 237) is **DENIED**.

SIGNED this 27th day of January, 2017.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE